Syllabus.

[No. 2045.]

ROBERT CARR *v.* THE STATE.

1. PRACTICE — CHANGE OF VENUE.— A defendant in a felony case is not required to except to the indictment or to interpose special pleas before the State has announced for trial, but may do so afterwards, and, therefore, article 580 of the Code of Criminal Procedure, which provides that an application for a change of venue *may* be heard before either party has announced ready for trial, and which, at the same time, requires that, before the change is ordered, all exceptions and special pleas then on file shall be determined by the court, is merely directory, and cannot operate to defeat the application for the change of venue, because. though filed and presented before the accused announced for trial, it was so filed after the State had announced. It is in time if filed after the State, though before the accused, has announced.

2. SAME — SUSTAINING AND CONTROVERTING AFFIDAVITS — CASE STATED.— A defendant, setting up in his application for a change of venue both of the statutory grounds, is entitled to the change if he establishes either ground. In order to raise an issue upon the application of the accused, it is incumbent upon the State to file a controverting affidavit, impeaching the credibility of the affiants supporting the application, or attacking their means of knowledge. In this case the application, supported by requisite affidavits, alleged both the existence of popular prejudice against the accused, and an influential combination seeking his conviction. The controverting affidavit filed by the State assailed the means of knowledge possessed by the supporting affiants, as to the existence of the influential combination alleged, but was silent as to their means of knowledge respecting the existence of popular prejudice. *Held*, that the controverting affidavit was insufficient to moot an issue upon the ground of prejudice, and for that reason the change of venue should have been awarded upon the face of the application. See the opinion *in extenso*.

3. QUALIFICATION OF A WITNESS.— EXECUTIVE PARDON, which is a remission of guilt, is either full, partial or conditional. It is full when it freely and unconditionally absolves the party from all the legal consequences of his crime and conviction, direct and collateral. It is partial when it remits only a portion of the punishment, or absolves from only a portion of the legal consequences of the crime. It is conditional when it does not become operative until the grantee has performed some specified act, or when it becomes void upon the occurrence of some specified event. No other than a *full* pardon can operate to restore to a felony convict the competency of a witness in the courts of this State. The pardon of the impugned witness in this case was qualified by the condition subsequent that it was subject to revocation by the Governor whenever it shall be determined by the said Governor that the convict has violated any of the criminal laws of this State. *Held*, by the majority of the court, that such conditional pardon did not restore to the witness the competency to testify, and in permitting him to be introduced as a witness, the trial court erred. But see the opinion of Hurt, Judge, maintaining the converse of the doctrine to the extent that the effect of a pardon with a condition subsequent is the same as that of a full pardon until the same is vitiated by the happening of the condition.

4. BURGLARY — INDICTMENT — EVIDENCE — FACT CASE. — To constitute the offense of burglary there must be a breaking, and such breaking is constituted by an entry with actual force, which, to constitute burglary by day, must be applied to the building, and not otherwise, and the entrance must not be by threats or fraud. A burglary by night is constituted by an entrance effected by force, whether applied to the building or otherwise, or by threats and fraud. The indictment in this case charges that the accused did "break and enter" the house, but does not allege the breaking and entry to have been either by day or night. Such an indictment is sufficient to authorize a conviction for burglary, whether by day or night, if supported by proof that the force was applied to the building, but, failing to allege the entry by night, it would not authorize a conviction upon proof that the force was used otherwise than upon the building. But see the statement of the case for evidence *held* sufficient to support both the indictment and the conviction, though the judgment is reversed on other grounds.

APPEAL from the District Court of Gonzales. Tried below before the Hon. George McCormick.

The conviction in this case was for the burglary of the store-house of Samuel Brown and J. W. Peebles, in Gonzales county, Texas, on the 10th day of December, 1883. A term of seven years in the penitentiary was the penalty assessed.

S. H. Brown was the first witness for the State. He testified that he had lived in the town of Leesburg, Gonzales county, Texas, for a number of years, during the last three of which he had been engaged in the mercantile business with J. W. Peebles, under the firm name of Peebles & Brown. Witness had known the defendant for the last ten years. He had also known James Martin and James Collins for the same length of time. The store-house of Peebles & Brown, situated in the town of Leesburg, Gonzales county, Texas, was broken into on the night of December 31, 1883, by prying off some plank from the space under a window, making an opening large enough to admit the body of a man. The witness and his partner left their store on the evening of December 31, 1883, between sundown and dark. They left all the doors and windows securely locked and fastened. At that time their store contained about $5,000 worth of goods, wares and merchandise, and an iron safe which contained $1,400 or $1,500 in money. The safe weighed about one thousand pounds. About $600 of the money in the safe belonged to the witness and his partner, and about $800 was deposit money belonging to various parties. The goods were worth $5,000, and the money was worth its face value, $1,400 or $1,500. No one had the witness's consent to break into that store, or to go into that safe, and no one had his consent to remove there-

from any goods, wares, merchandise or money. Besides the money described, the safe contained deeds and papers belonging to the witness and Peebles, and a pair of ear-bobs belonging to the witness's wife. The money belonging to witness and Peebles as partners, as near as witness could remember, consisted of $350 in currency, of which one bill was a fifty-dollar silver certificate, and the residue five-dollar, ten-dollar and twenty-dollar bills of the United States currency; about $165 in gold, $140 of which was in twenty-dollar pieces; about $80 in silver lying loose in the safe, and $12 or $15 in mutilated coin. The deposits consisted of $480 in currency belonging to C. C. Littlefield; $60 in silver which belonged to the Masonic Lodge; $130 belonging to Mr. McCulloch, and $20 belonging to Billy Brown.

The night of December 31, 1883, on which the burglary was committed, was a very cold one, the wind being high and stormy. The witness lived about three hundred yards distant from the store. The witness was told, early on the next morning, that his safe was standing in the street, and that it had been broken into. Witness repaired to his store and discovered that his store had been broken into in the manner above stated, and the safe taken into the street, some twenty-five yards distant from the store, and had been cut into through the back. All of the money described, save $40 or $50 which was found in the rubbish, was missing, and the papers, deeds and documents were scattered about. Witness noticed blood stains on some of the papers and on one of the books. An ax which was found lying near the safe was claimed by Mr. Caraway, who owned a saddle shop close by. One of witness's wife's ear-bobs was also missing. The hole in the safe was larger on the outside than where it entered the cavity. It was large enough throughout to admit the introduction of a man's hand and arm. The edges of the hole where it entered the safe were sharp and jagged. Some of the money in the safe was in a leather or morocco pocket-book, some in shot sacks, and some loose. The safe contained also a cigar box, a Willimantic thread box, and an empty buckskin money purse with a metal clasp. Besides the money, the purse, pocket-book and one ear-bob were gone. Witness neither saw nor heard any disturbance on the night of the burglary, which, as stated, was very cold, windy and stormy. Witness was up once during the night, and lighted his lamp for a minute or two. That was between 1 and 2 o'clock. The fore wheels and tongue of the wagon of the witness's brother, W. H. Brown, were found about one hundred and fifty yards from the safe on the morning after the burglary. Wit-

ness had never recovered any of the money. Some months after the burglary young Milton Lott brought the missing ear-bob to the witness. The witness knew where Lott got it only from what Lott told him. Witness could not say that there was not a one hundred dollar bill among the bills in the safe, but, if so, he did not remember it.

W. E. Swann was the next witness for the State. He testified that he lived near Leesville, in Gonzales county, Texas. On the evening of December 31, 1883, witness went to an old outhouse in Joe Murray's pasture, about a quarter of a mile from the house occupied by James Collins, where he engaged in a game of cards with James Martin, James Ledbetter and Bob Harvey. Witness saw John Hester, James Collins, Mitch Carpenter and Goode Trammell about the house during the game. During the time that the cards were being played the defendant rode up to the house and said to some one in the crowd: "Come on; the boys are waiting for you." Witness thought he spoke to James Martin. This occurred about an hour by sun. The crowd had a supply of whisky at the house, and Martin appeared to get pretty "tight" and somewhat sick on it. Witness did not remember when the defendant, Hester Trammell, Collins and Carpenter left. When the game was closed, about dark, no one was at the house but witness, Martin, Ledbetter and Harvey. Ledbetter and Harvey went together towards Leesville, James Martin to James Collins's house, and witness went home.

James Ledbetter was the next witness for the State. He testified substantially as did the witness Swann, and, in addition, said that he went from the card party to the town of Leesville, about three quarters of a mile distant, with Bob Harvey, and that he hitched his horse to Fayette Smith's saloon, and slept in the saloon all night.

N. E. Trammell testified, for the State, substantially as did the witness Swann, and, in addition, stated that just before dark he left the party in the old house to go into the pasture after James Martin's horse, which had strayed off with the saddle on. When he left the house, Swann, Martin, Ledbetter and Harvey were playing cards. Collins and Hester were also there, but were not playing. When the witness returned without Martin's horse, the party had all gone off. Witness then rode up to Collins's house, about a quarter of a mile distant, where he found Hester and Collins at supper. James Martin was sick, and, the witness thought, ate no supper. He had drank too much whisky. Witness joined the parties named at supper. Collins's wife waited on the table. If Mrs. Collins was sick that night the witness did not observe it. Supper was served

after dark.   While witness, Hester and Collins were at the supper table, Robert Carr, the defendant, rode up and came into the house. Witness did not remember positively whether or not Carr took supper.   After supper Hester and Collins went to Murray's pasture to look for Martin's horse.   Witness left Collins's house within a short time and went to Henry Trammell's house, four miles distant, and remained over night.   The night was very cold.   Two days later the witness heard of the robbery of Peebles & Brown's store.

· Mitch Carpenter testified, for the State, that on December 31, 1883, he lived on Joe Murray's place near Leesville, about two hundred yards from the house occupied by James Collins.   Witness was well acquainted with the defendant, James Collins, James Martin and John Hester.   Hester had been making Collins's house his home for two weeks prior to December 31, 1883.   IIe was at Collins's house on December 30, 1883, and witness saw him there at dinner on the 31st.   On the evening of the 31st, W. E. Swann, James Ledbetter, Bob Harvey and James Martin joined in a game of cards in an old house in Murray's pasture near Collins's house. John Hester, James Collins, Goode Trammell and the defendant were present, but were not playing.

John Hester was the next witness for the State.   He testified that he was acquainted with the defendant, and with James Martin and James Collins.   For two or three weeks during the month of December, 1883, the witness stayed at the house of James Collins, and worked with cattle for Joe Murray.   On the 31st day of that month the witness, defendant, James Martin and James Collins entered into an agreement to rob the safe of Peebles & Brown in Leesville, Gonzales county, Texas.   On the evening of the same day, the parties named met at an old outhouse in Joe Murray's pasture, near Leesville, and James Martin, James Ledbetter, W. C. Swann and Bob Harvey got up a game of cards.   Goode Trammell and Mitch Carpenter were also there.   Defendant left the old outhouse some time during the evening.   The game of cards broke up some time between sundown and dark, and, as well as witness could recollect, Martin, Collins, Trammell and witness went together to Collins's house for supper.   While at supper the defendant came to Collins's house.   Witness did not think that Martin ate any supper, as he was sick from the effects of too much whisky.   After supper witness and Collins went to the pasture to look for Martin's horse, which had strayed off, saddled.   They left Martin, Trammell and the defendant at Collins's house.   Failing to find the horse, witness and Collins, after a time, returned to Collins's house.   Trammell

was gone when witness and Collins got back. Witness saw and talked to Mrs. Collins several times that night. The parties named, viz.: witness, defendant, Martin and Collins, remained at Collins's house until after midnight, when they left to rob Peebles & Brown's safe. Defendant and witness rode witness's horse and went ahead. Martin and Collins followed on the defendant's horse. Witness and the defendant went by the house of E. Carr, the defendant's father, where the defendant secured a crow-bar. Thence they went to Peebles & Brown's store, where they were presently joined by Martin and Collins. Witness and the defendant then went around behind Caraway's saddle shop to a wood-pile, and secured an ax. On their way to the wood-pile after the ax, they passed Fay Smith's saloon, where they saw a horse hitched which the defendant said belonged to James Ledbetter. Having secured the ax, witness and defendant returned to the store, when the defendant, with the crow-bar, got into the cow-pen which joined the store, and tore off some plank just under the store window. The defendant then went into the store through the opening thus made, and opened the store door from the inside, when witness, Martin and Collins entered the store through the door. They then rolled the safe to the platform in front of the store, next to the street. The four parties then went together to a school-house across the creek, about three hundred yards from the store. Martin and Collins stopped at the school-house, and defendant and witness went on to another house near by, and procured the fore wheels of a wagon with which the four parties returned to the store. They backed the wheels up to the safe and rolled the safe on them. The safe tilted the tongue up and fell to the ground. The safe was too heavy to be lifted back on the wheels, and the party concluded to roll it into a hollow across the street and there break into it. They rolled it into the street about twenty-five steps, when they found it so impeded by the sand they concluded to open it there. James Martin, armed with a pistol, went up the street to keep watch, and Collins went a short distance down the street for the same purpose. Witness stood guard at the safe, while the defendant with the ax and crow-bar made a hole through the back of the safe large enough to get his hands in. They then proceeded to remove the contents of the safe. They found some money in a large leather pocket-book, some in a shot-sack, and some loose in the safe. Witness thought that the safe contained a cigar box. They took out some papers, some of which they put back; others blew away. If a small buckskin money purse and a lady's ear-bob were secured by any of the parties, witness did not

see them.   While at work removing the contents of the safe, the
defendant remarked that he had cut his arm on the jagged edges of
the hole.   Witness saw no one moving about during the entire time
of the burglary, except for a minute or two, a light appeared in S.
H. Brown's house.   The parties then proceeded southeast to a point
about three quarters of a mile from town, and on the side of a hill,
and in a growth of black jacks, built up a fire and divided the money,
each man securing $350 or $360.   Each man got one or two twenty-
dollar gold pieces.   There were several one hundred-dollar bills
among the currency bills.   There was at least one one hundred-dollar
bill, for witness got one, and he thought each of his three accom-
plices got one.   They then  burned the pocket-book, sack and paper
in which they found  some of the money wrapped.   They then re-
turned to the safe, got the crow-bar and took it back to E. Carr's
place.   They left the ax·at the safe.   The four parties then went to
Collins's house.   Witness changed the saddle he was riding for his
own, and left immediately for G. Baker's place, twenty miles dis-
tant.   It was not yet day.   Witness arrived at Baker's place about
noon on January 1, 1884.

Cross-examined, the witness said that he was just back from the
penitentiary, to which he had been sentenced for five years for the
theft of sheep.   He was pardoned by the Governor in order to tes-
tify in this case.   Before the witness was taken to the penitentiary
after his conviction, he wrote a letter to the citizens of the neigh-
borhood, to the effect that he wanted to change his course, and that
he knew all about the robbery of Peebles & Brown's store.   Some
three or four months after the witness was incarcerated in the peni-
tentiary, he was visited by Sheriff Jones, with whom he had a con-
versation about the robbery, and to whom he told all the facts to
which he has here testified.   Four or five weeks prior to this trial
witness was again visited in the penitentiary by Sheriff Jones, ac-
companied by Mr. Ponton.   Ponton said that he had understood
that witness wanted to make a statement about it.   Witness replied
that he did.   He then told witness that witness could, if he wanted
to, make a purely voluntary statement; that he could offer witness
no inducement, nor promise him anything in regard to the matter,
and that whatever statement witness made could be used in evidence
against him, but not for him.   The witness told him that he never-
theless desired to make the statement, and proceeded to make it
just as he has related the facts on this stand.   Sheriff Jones re-
duced witness's statement to writing as he made it, and when the
two gentlemen left they told witness that they would go through

Austin, see the Governor, and try to get witness pardoned, in order to qualify witness to testify in this case. They also told witness that they would do what they could to secure the dismissal of a case then pending against the witness in the district court of Gonzales county. This was the witness whose pardon is the subject-matter of the third head-note.

, W. H. Brown testified, for the State, that he and S. H. Brown, of Peebles & Brown, were brothers. Witness lived across the creek, near the school-house, and about three hundred yards from Peebles & Brown's store. On the morning after the robbery the witness missed the fore wheels of his wagon, and afterwards found them in the rear of Yeager's store, about seventy-five yards from Peebles & Brown's store. The wheels were taken from the witness's house on the night of the robbery. Witness saw Peebles & Brown's safe on the next morning. He knew a certain crow-bar that had been in the vicinity of Leesburg for twenty years. It was used by the people of Leesburg in common. It was an instrument of peculiar shape, one end being flattened out and the other drawn to a four sided point. Some two or three months prior to this trial the witness's son brought that crow-bar to witness's house, as Mr. Carr, the defendant's father, had sent for it. While the crow-bar was at witness's house, witness took it to the safe of Peebles & Brown, and applied the sharp four-sided point to a hole which must have been made in the safe at the time it was rifled, and found it to fit to a nicety. The same hole could have been made with any other tool with a like point of the same size.

Ben Lott testified, for the State, that he lived in Leesville in December, 1883. He heard of the robbery of Peebles & Brown's store shortly after it occurred. In the August following, while the witness and his son were getting house logs at a point on the side of a rocky hill, among some black jack and post oak trees, about three quarters of a mile southeast of Leesville, they found the remains of a fire long burned out. In the ashes of that fire they found a lady's ear-bob, and the metal remains of a money purse. They seemed to have been subjected to fire and heat. Witness's son took them home with him.

Milton Lott, the son of Ben Lott, testified substantially as did his father, and, in addition, said that besides the ear-bob and the purse-metal, he found in the ashes a lump of whitish compound similar to a compound he saw in the back of Peebles & Brown's safe, where it had been cut. Witness showed the ear-bob to Mr. S. H. Brown, and Brown said that was his wife's.

Hill Deering testified, for the State, that, in January after the robbery of Peebles & Brown's store, he met the defendant in Hirshfield's saloon in Gonzales. Defendant invited witness to drink. He threw a twenty-dollar gold piece on the counter to pay for the drinks, and remarked: "I suppose you will know something about that twenty-dollar piece sometime, as I presume John Hester has told you all about it."

Sam Hester testified, for the State, that soon after he was released from jail in January or February, 1884, he met the defendant in Logan's saloon in the town of Gonzales. Defendant at that time told witness that he, James Martin, James Collins and John Hester robbed Peebles & Brown's safe on that cold night, and that he had just got back from San Antonio, where he had had a "high old time."

Simpson Alley testified, for the State, that in January, 1884, he approached the defendant and James Collins, whom he saw in Hirshfield's saloon in Gonzales. They were discussing the robbery of Peebles & Brown's safe. They told witness that they, with John Hester and James Martin, did the work. Alex. Alley and Louis Carroll were near by, but witness could not say that they heard what was said. That night defendant told witness all about the robbery. He several times talked to witness about it.

W. E. Jones, sheriff of Gonzales county, testified, for the State, that he was informed that John Hester knew all about the safe robbery at Leesville. Witness visited Huntsville several months before this trial, and had a conversation with John Hester, who was there in the penitentiary. Hester, in relating to him the facts of the robbery, made substantially the same statement that he made on this trial. Witness reduced Hester's statement to writing. What was said by Hester was in answer to questions in writing propounded by the district attorney. At the time Hester made the statement, witness had no understanding with him with reference to an appeal to the Governor for a pardon. Hester made the statement voluntarily and without inducement. Some three or four weeks ago the witness again visited the penitentiary in company with Mr. Ponton. They asked for and obtained an interview with John Hester. Hester made again the same statement, which the witness reduced to writing, and which Hester signed. Mr. Ponton first warned him in the manner stated by Hester on the stand, before Hester made his statement. After the statement was made and signed by Hester, witness and Ponton told him that they wanted to use his testimony in the prosecution of this case, and

that they would see the Governor as they passed through Austin on their return, and secure his pardon if possible.    They told him also that they would exert their personal efforts to secure the dismissal of a case then pending against him in the district court of Gonzales county.

Cross-examined, the witness said that the Governor issued a pardon to Hester before this term of court, but there being a mistake of some kind in the charter of pardon, he issued the pardon under which Hester testified, which pardon the witness thought a pretty good one.    The State closed.

The counsel for the defense introduced, first, three bonds executed by Sam Hester on the 5th and 14th days of February, 1884, to answer charges of felonies preferred against him in the district court of Gonzales county.

E. Carr, the father of the defendant, testified in his son's behalf that he, defendant, left witness's house in Gonzales county on the first or second Sunday in February, to go to Presidio county.    He only knew from hearsay when the defendant went.

W. O. Martin testified, for the defense, that he saw the defendant on the 31st day of December, 1883, at the house of Clint Martin, witness's son, about one mile from Leesville, and about one mile from the old outhouse in Joe Murray's pasture, where the card playing was said to have taken place.    The defendant, Ornie Martin and Willie Underwood had some hogs at Clint Martin's to kill and clean on that evening.    Witness went to his son Clint's house again on the same evening, two or three hours later, and saw the defendant still there.    About 2 o'clock on the day after the safe robbery a party of men came to witness's house to search it for the stolen money.    They had a search warrant.    Dave McNabb was one of the party.    A day or two later the witness heard that some blood was found about the safe.    That information led him to observe the defendant's hands.    He could see no wounds on them.

J. T. Melvin testified, for the defense, that at the time of the safe robbery he was the justice of the peace of the Leesville precinct. Witness saw and examined the safe on the morning after the robbery, and saw blood on it.    A day or two afterwards the defendant came to witness's house and asked witness to examine his hands and arms.    Witness did so, but found no scratches or cuts.    At the request of the defendant's father, the witness, a day or two before this trial, accompanied by Mr. Ivey, applied a crow-bar to a hole in the safe.    The hole was too small for the point of the crow-bar.

Cross-examined, the witness said that he could not now say how

high up he examined the defendant's arm. He pushed the sleeve up on one arm, but could not now say which. He looked at it as the defendant held it out, and did not turn it over. He had hold of but one arm. The crow-bar applied to the hole in the safe was considerably blunted at the point,— was at least a half inch across the point.

A. T. Ivey testified, for the defense, that on the second Monday after the safe robbery he saw the defendant and looked at his hands up to the wrists. He saw only the back of his hands, and did not take hold of them. A large crowd were present, all parties showing hands. Two days before this trial, the witness, at the request of defendant's father, compared the point of the crow-bar to a hole in the safe. The hole was too small to admit the point of the instrument. Witness could not say that it was so blunted when Mr. W. H. Brown fitted it to the hole. Witness lived between Peebles & Brown's store and W. H. Brown's house in Leesville. Between 12 and 1 o'clock on the night of December 31, 1883, he heard his dogs barking as if at some party or parties passing.

David McNabb testified, for the defense, that his brother was absent from home on the night of December 31, 1883, and he went to James Collins's house to hunt him. He reached Collins's house about 11 o'clock, hailed and was answered by Mrs. Collins. James Collins presently came to the door. Witness then went to the old house in the pasture, which had been a resort for card players. Not finding his brother, witness went home, passing out of the pasture by James Collins's house.

Cross-examined, the witness testified that when he hailed at Collins's house, on the night of December 31, 1883, Mrs. Collins did not come to the door and say that no male person was in the house. Witness was then asked if he did not, on the day after the robbery, in his mother's house, and in the presence of William Williams, say that he went to Collins's house in search of his brother on the night of December 31, 1883, and saw a fire there and went to warm and then hailed, when Mrs. James Collins came to the door and said that there was no man person on the place. Witness answered that he had no recollection of having made such a statement, but if he did, he was not then, as now, speaking under oath; and if he made such statement to Williams, he made it to keep from being brought into court. Witness denied that, in the same conversation, he told Williams that after he left Collins's house he went to the outhouse in the pasture and stayed all night.

Clint Martin testified, for the defense, that the defendant was at

his house with Ornie Martin and Willie Underwood on the evening of December 31, 1883, killing hogs. Witness went to Leesville, leaving them there, and returned about sundown, just as defendant and Ornie Martin got on their horses and dragged a pot, which they had borrowed of Mr. James Mayfield, off towards Mr. Mayfield's house. Mayfield's house was between witness's and James Collins's house. Collins lived about one mile from the witness. Defendant was at the witness's house on the next morning at sunrise.

W. D. Underwood testified that, on the 31st day of December, 1883, defendant, James Martin, Ornie Martin and himself got up four hogs which Mr. Miles O'Neal had authorized him, witness, to get up and kill on shares. They got to Clint Martin's with the hogs about 12 o'clock. Just before they reached Clint's house, James Martin left the party to go to Leesville to get some whisky. About the middle of the evening the defendant was sent after James Martin and the whisky. Defendant was gone about an hour or two, and finally returned with the whisky, but without James Martin.

Cross-examined, the witness said that he got one hog, James Martin got the second, defendant the third, Ornie Martin the fourth, and there was no hog left for Miles O'Neal.

Sam McFarland testified, for the defense, that he lived about three hundred yards from Peebles & Brown's store. He was up most of the night of the robbery. About 11 o'clock he heard a noise which sounded like some one beating on a box turned upside down. On cross-examination, the witness said that he had no time-piece, and it was possible that he heard the noise as late as 2 o'clock.

Mr. Alexander testified, for the defense, that he saw Mr. Ivey examine defendant's hands up to the wrists. The witness saw no scratches or cuts on his hands or wrists.

Ed. Martin testified, for the defense, that the defendant left home for Presidio county on the first Sunday in February, 1884, and was gone about one month.

Mrs. James Collins testified, for the defense, that, at the time of the robbery of the safe in Leesville, she and her husband lived on Joe Murray's place. Witness heard of the robbery between 8 and 9 o'clock on the morning after it occurred. Witness did not see John Hester, Goode Trammell nor the defendant on the night of the robbery, nor, in fact, had she seen Hester for several days prior to that night. None of the parties named were at the house of James Collins either at supper or afterwards on that night. James Martin was then sick, and slept all night in the room adjoining the

witness's room.   James Collins was at home throughout the night, waiting upon the witness, who was sick, the period of her last confinement being but one month and one day off.   The witness did not sleep fifteen consecutive minutes during that night, and knew that her husband was not out of the house.   She suffered great pains and exacted her husband's almost constant attention.   Ornie Martin came to the house to see James Martin that night, at about 9 o'clock, and remained until about 12.   James Martin got up about daylight on the next morning, and the witness heard him decline her husband's invitation to remain to breakfast.   Dave McNabb came to the house about 11 o'clock on that night and hailed.   Witness answered, and he asked if witness's husband was at home.   Witness replied that he was, waked her husband up, and he went to the door and talked to McNabb.

Cross-examined, the witness testified that an indictment was pending against her husband for this same offense.   Witness's sickness seized her at the supper table on the night of the robbery, and she retired, leaving her husband at the supper table alone.   James Martin came after the witness went to bed.   If anybody save herself and husband ate supper at her house on that night, witness could not remember it.   If the defendant, or Trammell or John Hester were at the house on that night, the witness did not know it.   Hester had recently been staying at the house, but witness had not seen him for several days.   Mitch Carpenter did not tell the witness during the evening to prepare supper for four or five men.   She heard, but did not see, either James or Ornie Martin on that night.   Witness took no medicine nor did she send for a doctor on that night.   Witness was in attendance upon this court at a former day of this term, when James Martin was tried for this same offense.   She came as a witness for the defense, but was not called to the stand.   Witness had no recollection of telling Dave McNabb on the night of the robbery that there was no male person about the house.   If she went to the door to answer McNabb, she did not remember it.   Defense closed.

William Williams testified, for the State in rebuttal, that, at his mother's house, on the evening after the safe robbery, Dave McNabb told him that he went to Collins's house about 12 o'clock on the night of the robbery, hailed and was answered by Mrs. Collins, who came to the door and said that there was no male person on the place, and that he then went to the outhouse in Murray's pasture and remained all night.

Joe McNabb testified, for the State, that he came by James

Collins's house on the 31st day of December, 1883, about noon, and saw James Collins and John Hester shooting at a mark with a pistol.

A. J. Darnell testified, for the State, that he was convicted in Guadalupe county, Texas, for theft of cattle, and had been out of the penitentiary since the 29th day of May, 1885. At the January term, 1884, of the district court of Gonzales county, the witness was brought to Gonzales county for trial upon three cases pending against him. While in a room adjoining the court room, the defendant, whom the witness knew well, came in to see him, and asked him if he needed any money. Witness replied that he did. Defendant then said that he had $400 or $500 and could let witness have $50,— which, however, he never gave to witness. Witness asked him where he got so much money, and he said that he, Jim Martin, Jim Collins and John Hester robbed Peebles & Brown's safe. Witness remarked to him that he had better take care how he talked. Witness had several conversations with defendant about this safe-robbing business, before he went to Seguin to stand trial. The first was about eight and the second about two months before. Defendant, in each conversation, urged witness to help him rob Peebles & Brown's safe. Witness tried to dissuade the defendant from his expressed purpose, telling him that Peebles & Brown had been good friends to them, and ought not to be harmed by them, and that he, witness, "wanted none of that in his." Sheriff Jones and Mr. Ponton saw the witness in the penitentiary about this matter, got his voluntary statement, and agreed to see the Governor on their return through Austin about getting witness pardoned in time to testify in this case. They promised also to do what they could to get a case pending against witness dismissed.

Cross-examined, the witness said that when defendant spoke of letting him have $50, he was in sore need of money, and would have accepted the amount if defendant had given it to him.

The motion for new trial raised the questions discussed in the opinions. It will be observed that each of the three judges delivered an opinion in this case, and that, while all concurred in the disposition made of the case, the ruling upon the character and effect of the pardon granted to the State's witness Hester is based upon the opinions of Presiding Judge White and Judge Willson.

*Fly, Davidson & Davidson*, for the appellant. Article 580, Code Crim. Proc., provides that the application for change of venue may

be heard and determined before either party has announced ready. In this case defendant had not announced. We take it that "either" refers to the defendant as well as to the State, and that announcement by the defendant would be by "either;" and that we are right in this position the succeeding clause is proof, we think, positive, as that requires that before the motion can be heard and determined the plea of not guilty must be entered. This plea cannot be required to be made before an announcement by the State. We take it, then, the motion cannot be heard before an announcement by the State, and this statute being silent as to time of filing, we take it that it can be filed as a motion to quash, for a continuance and any other special pleas after the State has announced.

The State's motion to strike out the motion for change of venue denies the existence of prejudice or combination, and is supported by affidavits of nine persons denying that there is such prejudice or combination within their knowledge.

The application cannot be overcome by any number of affidavits of a negative character. (*Winkfield* v. *The State*, 41 Texas, 148; *Walker* v. *The State*, 42 Texas, 360.)

The said affidavits do not attack the credibility of the witnesses or their intelligence, but are altogether of a negative character. (Winkfield's and Walker's cases, *supra; Anschicks* v. *The State*, 45 Texas, 148.)

The second and third assignments of error raise the question of the admissibility of the testimony of John Hester and Andy Darnell, penitentiary convicts, with pardons conditioned that they would be revoked in case of a future violation of law by said convicts.

The condition of the pardon of Hester and Darnell is that, in case of a violation of the law in future, said pardons will be revoked.

Under this pardon the Governor can, on his own motion, reincarcerate these men. That he has this power is conceded. (*Ex parte Wells*, 18 Howard, 307; *State* v. *Smith*, 1 Bailey (S. C.), 283; 22 Gratt. (Va.), 789; *Flavell's Case*, 8 W. & S., 197; 2 Am. Law Reg., 487, note 3; *Cook* v. *Middlesex*, 2 Dutch., 326; *Ex parte Marks*, 4 Am. Crim. Law Mag., 919; 1 Bish. Cr. Law, sec. 760; 2 Samuel, chapter 16, verses 5–11; id., chapter 19, verses 16–24; 1 Kings, chapter 2, verses 5–10; id., chapter 2, verses 36–46.)

Then are they enfranchised? If they are enfranchised the Governor cannot disfranchise them. This is not a "one man" government. He can grant a conditional pardon upon a good condition. (Authorities cited above.)

The condition contained in the charter of pardon to Hester and Darnell is a condition subsequent and a lawful and good condition. (Same authorities as above.)

If this be true, the Governor upon breach of the conditions could forfeit and reincarcerate said convicts. (Same authorities cited above.)

Then these charters of conditional pardons do not enfranchise said convicts; if so, the Governor could not forfeit, and they would be restored to their full *status* of citizenship, which we have seen by the authorities above cited is not true.

" No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by due course of the law of the land." (Const., art. 1, sec. 19.)

If they are enfranchised by this pardon they are citizens and entitled to all the privileges and immunities of full citizenship or the rights that attach and belong to any other citizen of Texas, and they cannot be deprived of same except by "due course of law." If their privileges are restored and they become entitled to vote, testify and sit on juries, the Governor cannot take these rights from them; if they are not restored to these privileges and rights they cannot testify or vote. The Governor can pardon either upon a general full pardon or a condition, as we have seen, subject to revocation on breach of the condition.

The general or full pardon restores the competency of the convict as a witness; the conditional pardon does not, and does not enfranchise the convict. To restore competency to a witness, the pardon must be full, general and unconditional. (*Rivers* v. *The State,* 10 Texas Ct. App., 177; *Hunnicutt* v. *The State,* 18 Texas Ct. App., 498; *The State* v. *Foley,* 15 Nev., 64; 2 Crim. Law Mag., 837, title "Pardon;" 1 Bish. Crim. Law, sec. 763, 4th ed.)

The Governor can, upon the breach of the condition contained in the charter of pardon, consign the convicts to the penitentiary. (Authorities already cited.)

By what authority can he do this? By virtue of the breach of the condition. By what authority does the Governor pardon? By the authority vested in him by the Constitution and laws of Texas. (Const., art. 4, sec. 11; Code Crim. Proc., art. 981.)

Upon what is the pardon based? Upon the judgment of conviction of a proper court, and regularly enforced against the convict by due course of the law of the land. The Governor can relieve the convict from this judgment either fully or conditionally. If he grants full relief, the convict is placed beyond the power of the Gov-

ernor and is free; if he is only relieved conditionally, he can be reincarcerated by the Governor upon a breach of the condition. What judgment authorizes the Governor to re-arrest the convict? There can be no question but that it is the judgment under which the convict was placed in the penitentiary, and upon which the pardon was based. It cannot be upon any subsequent judgment. Then the judgment is not set aside; the conviction is still pending, and only suspended; by virtue of it alone can the convict be re-arrested on breach of the condition. The breach happens by a new violation of the law, and by this the convict breaks his contract with the Governor, and the Governor has him re-arrested on the original charge or judgment of conviction that was the basis of the pardon, and the convict is reincarcerated to finish the punishment under said conviction and to suffer the remainder of the penalty attaching under said judgment of conviction. Then Hester and Darnell are both under conviction of a felony. They are not restored to competency to testify, and, being under the conviction for felony, cannot testify, and it was error for the court to permit them to testify in this case. (Code Crim. Proc., art. 730, sec. 5.)

We take it, the pardon issued to Hester and Darnell only restores them to liberty indefinitely, and the termination of which depends upon their good conduct or the condition accepted by them from the Governor and the breach thereof, and the forfeiture of same by the Governor. It is a sort of parol of honor which prevents them from taking up arms against the State. It does not restore to them any franchise or privilege except liberty and freedom from confinement. (Authorities above cited. Also *Perkins* v. *Stevens*, 24 Pick. (Mass.), 277.)

The ninth assignment of error points out the error of the court in overruling defendant's motion in arrest of judgment for reasons therein set out for quashing the indictment. The indictment charges entry by breaking by force, without alleging whether in the night or day-time. There are three offenses declared to be burglary by the statute: 1. When the entry is made at night with the intent of committing felony or the crime of theft. 2. By entering a house in the day-time and remaining therein concealed until night for the purpose of committing a felony or the crime of theft. 3. When the entry of a house is made in the day-time by breaking with intent to commit a felony or theft. (*Conoly* v. *The State*, 2 Texas Ct. App., 417; P. C., arts. 704, 705.)

The distinction in these different offenses consists in the time of day or night and the mode of entry, of which there are three, to wit:

1, by force; 2, by threats; and 3, by fraud. Entry by either of these modes constitutes the offense of burglary if made in the night-time. (P. C., art. 704.) Entry by actual force in the day-time constitutes the offense of burglary. (P. C., arts. 705, 706.) Entry in day and remaining concealed until night, which carries the idea of fraud, constitutes the offense of burglary. (P. C., art. 704.) Of course to constitute either, the intent to commit a felony or theft is also necessary.

Which of these offenses is alleged in this case? Breaking implies force, actual force. (P. C., art. 708.) What is meant by force as used in art. 704, P. C., in defining burglary in the night? It is evidently different from that used in art. 708, in defining breaking. The illustration used in that article shows that it cannot mean less force, because there it is said that the smallest force is all that is required to constitute the offense, such as lifting a latch, etc.

The law makers evidently intended a difference, or why use the term force in the one, and breaking in the other, and immediately define breaking as consisting of the smallest amount of actual force? We take it, then, that the word force implies something more than mere actual force, such as is defined in the offense of burglary in the day-time. In this we are borne out by Judge Lindsey, in the case of *Robertson* v. *The State*, 32 Texas, 159, in which opinion he construes force, as used in defining burglary in the night, to carry with it the idea of violence to the person or to the house. In which position he is sustained by as good authority as 1 Bish. Cr. Law, sec. 327, where this learned author uses this language: " It (breaking) does not convey to the legal mind the idea of force and violence; the mere lifting of a latch . . . is in legal contemplation a breaking." And while we cannot agree with the learned judge in the case cited that a charge of breaking is sufficient without the allegation of time, the other constituent element in the offense, we do hold that his idea of the meaning of the word force is not only logical but sustained by eminent authority. Whatever may be the meaning of the word force, we are certain the Legislature, in enacting two statutes, one defining burglary at night to be by force, and the other defining burglary in the day-time to be by breaking, intended to make and have made a distinction. Let the force required at night convey an idea of less or greater force than is required by day; let it be imaginary or mental, as contemplated with actual or physical force; it matters not, the distinction is made. It is the law. By it we must abide. In accordance with it the defendant must be tried.

The indictment charges, " by force did break and enter." What effect have the words "by force?" Let us analyze this expression. What did he do? "Did break and enter." This is the allegation. How did he break? By force. By force, then, limits or qualifies "did break." After breaking, he entered "by force." It does not allege that he entered by force, but that "by force did break," and after breaking, did enter. We take it, then, that the entry was alleged to have been by breaking. This is one of the elements of the offense of burglary in the day-time. If the indictment charges anything, it charges breaking in the day-time.

Judge Ogden, in the case of *Matthews* v. *The State*, 36 Texas, 675, holds to the opposite view to that above cited by Judge Lindsey. The latter holds that force implies more than breaking. The former holds that breaking includes or implies force, and that an indictment charging breaking at night is sufficient to charge the offense of burglary at night. However this may be (we cannot, however, indorse this idea in the face of the statute), we take it that it could only be applicable where the allegation is that it was done at night. For, as we have seen, as is held by Judge White in *Conoly* v. *The State*, 2 Texas Ct. App., 417, there are three distinct offenses defined as burglary, the analysis of which will show that the distinctive elements of each consist in the time and manner. To charge that one did "in the day-time enter" would not be a sufficient allegation not that he did at night enter. The element of time cannot be eliminated any more than the element of manner. It takes both elements to constitute the offense. The indictment must allege all of the necessary and distinctive elements of the offense, and set forth the offense in plain and intelligible words, and put defendant upon notice as to the nature of the offense with which he is charged. (Code Crim. Proc., art. 420, sec. 7; *Huntsman* v. *The State*, 12 Texas Ct. App., 619, and authorities.)

This indictment does not do this. Article 705 defines two offenses known as burglary. When the statute defines an offense, the indictment must follow strictly the statutory definition. (Same authorities.)

The indictment in this case fails to do this. The definition as given by the statute distinguishes the three offenses by the distinctive elements of time and manner. The indictment eliminates one of these necessary and distinctive elements,— the element of time.

As we have shown, by force as used in the indictment describes the manner and means of breaking; but to meet a probable phase of the case, we say the indictment cannot be construed to set out two separate

counts, one by force and the other by breaking. If this be so, according to the opinion of the court in the case of *Gonzales* v. *The State*, 11 Texas Ct. App., 657, the State would not be required to elect. But we say it cannot be construed as two counts. It is charged " by force did break;" only one act charged; and besides, if there were two different counts, each must charge the offense contained in the count with sufficient distinctness and precision to charge fully and completely the offense therein contained, so as to leave no doubt as to the offense charged in the count; for upon one of the counts the conviction must be had, and the conviction will not stand where the offense is not sufficiently alleged. (Wh. Am. Law (3d ed.), 204, and authorities above cited.)

If the indictment in this case be sufficient, we ask upon what phase of the law will the court charge? His charge must conform to the allegation in the indictment. Will he charge burglary by force at night, by breaking in the day-time, or will it be left as was the learned judge in this case,— in the sad dilemma of charging nothing or attempting to charge every offense known as burglary with all the elements of mode, consisting of fraud, force, threats and breaking, and of time, consisting of two, day and night? Surely the indictment should be at least sufficient to notify the judge on the bench of the nature of the offense charged against the defendant. It seems this indictment does not. Then how can it be said to notify the defendant of the nature of the offense with which he is charged? As we have seen, there are three distinct offenses known as burglary, distinguished from each other by the elements of time and mode. The indictment charges neither, and it therefore, we say, charges no offense.

If breaking implies force (36 Texas, 675), then the elements of time must accompany the elements of mode in order to make the distinction and notify the defendant of which offense he is charged. It fails to do this. Therefore we say it is vague, uncertain and indefinite, and does not put defendant upon notice of what offense he is charged. (Same authorities.)

It cannot be held that, because the punishment is the same, it is the same offense. If this be so, then bribery (P. C., art. 120), false swearing (art. 196), subornation of perjury (art. 199), and giving a false certificate (art. 230), and many others, all constitute the same offense, for the punishment is the same for all.

*J. H. Burts*, Assistant Attorney-General, and *Ponton & Fly*, for the State.

HURT, JUDGE. This conviction was for burglary. The appellant filed an application for a change of venue upon the grounds that there existed so great a prejudice against him that he could not obtain a fair and impartial trial; and, 2d, because there existed in said county a dangerous combination against him, instigated by influential persons, by reason of which he could not expect a fair trial. Appellant's affidavit was supported by that of three persons, to wit, J. N. Perry, Thomas Day and P. D. Ellis. This application was filed and presented to the court after the State, but before the defendant, had announced ready for trial. The district attorney moved to strike it out because it came too late.

Article 580, Code of Criminal Procedure, provides that the application *may* be heard before either party has announced ready for trial. This evidently is directory; for, before the change is ordered, all motions to set aside the indictment, and all special pleas and exceptions which are to be determined by the judge, and which have been filed, shall be disposed of by the court. Now, in case of felony, the defendant is not required to except to the indictment or interpose special pleas before the State has announced ready for trial. After an announcement by the State, defendant can except or plead specially to the indictment, and with these pleadings pending he may apply for a change of venue; but before the change is ordered these pleas should be disposed of by the court.

We are of the opinion that the application for the change of venue did not come too late.

The district attorney answered the application, denying the existence of such combination, or that there was such prejudice in the county as would prevent defendant from obtaining a fair and impartial trial. He does not question the credibility of the defendant's supporting affiants, nor their means of knowledge. We have, however, the affidavits of nine citizens of Gonzales county, controverting the application. It is stated in this affidavit that the affiants believe that defendant can have a fair and impartial trial; that they do not believe that there is any dangerous combination against defendant by reason of which he cannot get a fair trial. They further say that J. N. Perry, Thomas Day and P. D. Ellis live in the extreme western portion of the county, in the immediate vicinity of where the offense was committed, and that Ellis is a brother-in-law of James Collins, who is also charged with the same offense. They also charge that they believe that the means of knowledge of the said Perry, Ellis and Day is too limited to warrant them in swearing that there is a combination of influential persons in the county against defendant, such as would prevent him from obtain-

ing a fair and impartial trial. Then follows a statement showing in what part of the county each affiant lived, so as to make it probable that their means of knowledge, relative to the existence or non-existence of the supposed combination, or prejudice, was good, and at least superior to that of Perry, Ellis and Day.

We are not informed by the record what disposition was made of the motion by the district attorney to strike out the appellant's application. It certainly should not have prevailed, because either of the grounds therein stated, if true, entitled the defendant to a change of venue.

Upon this subject, under the law as amended by article 583, Code of Criminal Procedure, there must be an issue formed between the State and the defendant. This is effected by the affidavit of a credible person, attacking either the credibility or means of knowledge of the applicant's compurgators. In this case we have the affidavits of nine persons, but neither the credibility or means of knowledge of defendant's supporting affiants is attacked. It is true the controverting affidavit states that the affiants believe that the means of knowledge of Perry, Ellis and Day is too limited to warrant them in swearing that there is a combination of influential persons in Gonzales county against defendant, such as would prevent him from obtaining a fair and impartial trial. In this the means of knowledge of the compurgators, with reference to the existence of a combination against defendant, is attacked, but no question as to their means of knowledge relating to the existence of prejudice in the county is made or intended to be made in or by the controverting affidavit.

Appellant was entitled to a change of venue upon either ground, if true, and his compurgators may have been thoroughly informed regarding the existence of the prejudice in the county, without being sufficiently informed of the combination against defendant. There is, therefore, no issue between the state and the defendant upon the existence of such prejudice in the county as will prevent defendant from obtaining a fair and impartial trial. This being the case, he was entitled to a change of venue. (See the subject discussed in *Davis* v. *The State, ante,* p. 201.)

Notwithstanding there was no issue formed between the parties upon one of the grounds for change of venue relied on by defendant in his application, still he proposed to prove affirmatively:

1st. That there was such combination against him; and

2d. That in fact there was such prejudice in the county against him that he could not obtain a fair and impartial trial.

Now, without an issue between the parties as to the existence of

prejudice in the county, defendant was not required to prove any-thing, having the right to the change upon an unquestioned ground. But let us suppose that an issue had been formed between the par-ties upon both grounds relied upon by defendant, would, in such a case, defendant have the right to make such proof as that offered by him as above? We think so. (See *Davis* v. *The State, supra.*) In this case, however, the court denied him the right, rejected the offered proof, and overruled his application for change of venue. This was error for which the judgment must be remanded.

It appears from the record that one John Hester had been con-victed of the theft of sheep of greater value than $20. That he, upon said conviction, had been sentenced to five years' confinement in the penitentiary at hard labor. When offered as a witness, the record of his conviction and sentence being produced in evidence by defendant, counsel for defendant objected to his testifying, because of said conviction, etc. Whereupon the State produced in evidence a pardon containing the following provisions: " Subject to revocation by the Governor of Texas whenever it shall be determined by said Governor that he has violated any of the criminal laws of this State," and again proposed the convict as a witness. The defendant ob-jected upon the ground that this was a conditional pardon, and that such pardon did not restore him to his competency as a witness. The court overruled the objection, and Hester was sworn as a wit-ness for the State; to which the defendant objected, and reserved his bill of exceptions.

" An absolute pardon is one which frees the prisoner without any condition whatever. A conditional pardon is one to which a condi-tion is annexed, performance of which is necessary to the validity of the pardon. (1 Bail., 283; 10 Ark., 284; 1 McCord, 176; 1 Park. Cr. Cases, 47.) If the pardon be conditional, the condition may be either precedent or subsequent; if precedent,— that is, if by its terms some event is to transpire before it takes effect,— its operation is deferred until the event occurs. But if the condition is subsequent, the pardon goes into operation immediately, yet becomes void when-ever the condition is broken." (1 Bish. Cr. Law, 914.)

The effect of a full or absolute pardon is to absolve the party from all the legal consequences of his crime, and of his conviction, direct and collateral; including the punishment, whether of impris-onment, pecuniary penalty, or whatever else the law has provided.

Among the collateral consequences of conviction for felony is the incapacity to be a witness; this is restored by a full pardon. Mr. Bishop says, however: " yet only a full pardon has this effect," cit-

ing in support of this proposition *Perkins* v. *Stevens*, 24 Pick., 277. Upon an examination of that case it will be found that there was not annexed to the pardon either a precedent or subsequent condition. In that case the Governor remitted to McKenzie the residue of the punishment he was sentenced to endure in the State prison; this was the extent of the pardon. There was no intention on the part of the Governor to pardon the offense. Unquestionably if there be a condition precedent annexed to a pardon, the operation of the pardon is deferred until the condition is performed or the event has occurred. If, however, the condition is subsequent, the pardon with all of its consequences goes into operation immediately, becoming void whenever the condition is broken. (1 Bish. Cr. Law, § 914.) The effect, therefore, of a pardon with a subsequent condition is the same as a full unconditional pardon until the condition is broken. I am of the opinion that Hester was a competent witness, and that there was no error in overruling appellant's objections to him upon the ground of incompetency.

The indictment charges that defendant did break and enter the house, but there is no allegation as to night or day,— that is, it is not alleged that the entry was at night, nor is it alleged that it was in the day-time.

First question: Is the indictment sufficient? Burglary is constituted by entering a house by force, threats or fraud at night, with intent to commit felony or theft; also by entering a house in the day-time, by breaking, with same intent. The *entry*, to constitute burglary, if at night, must be by force;— threats or fraud not being in this case. If in the day-time, the *entry* must be by *breaking*. But suppose the entry was in fact in the day-time, the indictment is sufficient without alleging "in the day-time," because it alleges that the entry was by breaking, and, whether at night or in the day-time, such *entry* is burglarious.

Now let us suppose that the entry was at night. The indictment would be good because, whether at night or in the day-time, such entry would be burglary. (*Sullivan* v. *The State*, 13 Texas Ct. App., 462.)

By a close inspection of articles 705 and 708, Penal Code, it will be seen that by article 705, to constitute burglary, there must be a breaking; this is constituted by an entry with actual force (article 707); and this actual force or breaking must be exerted upon the building or house to obtain an entrance therein,— that is, the force mentioned in article 708, and which is declared a breaking, must be applied to the house in order to effect an entrance. Hence, burg-

lary cannot be constituted in the day-time by an entrance obtained by threats or fraud, but the entrance must be by force used upon the building.

But, on the other hand, if at night, burglary is constituted by entering a house by breaking, or, which is the same thing, force used upon the house to effect an entrance, or by "force which is not applied to the house," or by threats or fraud. There may be force which is not applied to the house. To illustrate: Suppose the owner or occupant of the house is in or near the door, which is wide open. The burglars seize him and remove him from the door, and place him out of their way, enter and rifle the house. Now in this supposed case there is no breaking or force used upon the house, yet this would be burglary. Therefore we conclude that, if at night, force of any character, whether applied to the building or not, if resorted to in order to effect an entry, comes within the meaning of the term "force" as used in article 704, but not within the meaning of the same word as used in article 708. If, therefore, upon the trial it should be developed that force was used, but not upon the house, the indictment failing to allege that the entry was at night, without such allegation a conviction could not legally be had. For when such force is resorted to, to effect an entrance, to constitute burglarious entry it must be at night,— and the same rule obtains with reference to threats or fraud.

But if, upon the trial, the evidence should show that the entry into the house was effected by force applied to the house, which would be a breaking, the indictment alleging an entrance by force and breaking, there is no necessity to allege that it was at night; because, if such force is used, whether at night or in the day-time, accompanied by the intent to commit felony or theft, this would be a burglarious entry.

We conclude that, as the evidence in this case establishes an entrance by breaking, the conviction was legal, such evidence being supported by the allegation.

We have examined the argument of counsel for appellant upon the insufficiency of the evidence to sustain this conviction, in connection with the statement of facts, and must say that, in our opinion, the verdict is supported by the evidence. This court cannot pass upon the credibility of the witnesses, this being the province of the jury. Hester, the accomplice, was amply corroborated by other witnesses besides Darnell.

The judgment, however, must be reversed because of the action of the learned judge below with reference to the application to

change the venue.   The judgment is reversed and the case re-manded.

WHITE, PRESIDING JUDGE.   With regard to the effect and char-acter of the pardon granted by the Governor to the witness Hester, I cannot concur in the views expressed in Judge Hurt's opinion. The conditions annexed to the pardon were that it should be "sub-ject to revocation by the Governor of Texas whenever it shall be determined by the said Governor that he has violated any of the criminal laws of the State."   No one will deny that the power to grant pardons conferred by the Constitution (Const., art. IV, § 11) carries with it the power to make the pardon full, partial or condi-tional.   Such has always been the law, as we understand it, both in England and America.   (1 Bish. Crim. L., § 914.)   Another rule which, we think, may be considered sound in reason and law, is that "the Governor may annex to a pardon any condition, whether precedent or subsequent, not forbidden by law, and it is binding upon the grantee."   (*Flavell's Case*, 8 Watts & Serg. (Pa.), 197; *Hunt, Ex parte*, 10 Ark., 284; *Ex parte Wells*, 18 Howard (U. S.), 307.)

A full pardon absolves the party from all the legal consequences of his crime, and amongst the disabilities removed is his incapacity to be a witness.   Only a full pardon has this effect.   (1 Bish. Crim. L., § 917.)   The effect of a full pardon "is to make the offender a new man; to acquit him of all corporal penalties and forfeitures annexed to the offense for which he obtains his pardon, and not so much to restore his former as to give him a *new credit and capacity*." (*Hunnicutt* v. *The State*, 18 Texas Ct. App., 499, citing 4 Black. Com., 402; 1 Greenl. Ev., § 377; *People* v. *Pease*, 3 Johns. Cases, 333; *Wood* v. *Fitzgerald*, 3 Oreg., 568; *In re Deming*, 10 Johns. Cases, 232; *State* v. *Baptiste*, 26 La. Ann., 136; *Ex parte Hunt*, 5 Eng. (Ark.), 284; *Hester* v. *Comm.*, 85 Pa. St., 154; 2 Hawk. P. C., 547, and cases there cited; 1 Phill. Ev., 21; 1 Gilb. Ev., 259.)

A full pardon is a remission of guilt; it releases the offense and obliterates it in legal contemplation.   (1 Bish. Cr. L., § 898; *Osborn* v. *United States*, 91 U. S., 474.)   Hawkins says: "I take it to be settled at this day that the pardon of a treason or felony, even after a conviction or attainder, does so far clear the party from the in-famy of all other consequences of his crime that he may not only have an action for scandal in calling him traitor or felon after the time of the pardon, but may also be a good witness notwithstanding the attainder or conviction; *because the pardon makes him, as it*

*were, a new man* and blots out his offense." (2 Hawk. P. C., p. 547, § 48; *Hunnicutt* v. *The State*, 18 Texas Ct. App., 499; *Knote* v. *United States*, 5 Otto, 153; 2 Abb., 149.) A full pardon blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. (*Ex parte Garland*, 4 Wall. (U. S.), 333.)

From these authorities it becomes evident that before a convict's competency as a witness is restored he must have been absolved from all the consequences of his crime and its punishment. There must have been a remission of his guilt; he must, as it were, have been made *a new man with new capacity and credit*, whose offense has been blotted out. "Lord Coke says a pardon is a work of mercy whereby the king *forgives* crimes. It is frequently conditional, as he may extend his mercy upon what terms he pleases, and annex to his bounty a condition precedent or subsequent, on the perform-ance of which the validity of the pardon will depend. If the felon does not perform the condition of the pardon, it will be altogether void and he may be brought to the bar and remanded to suffer the pun-ishment to which he was originally sentenced." (Church on Hab. Corp., § 458.)

Mr. Bishop says, "a conditional pardon may be on condition either precedent or subsequent; if precedent,— that is, if by its terms some event is to transpire before it takes effect,— its operation is deferred until the event occurs. If the condition is subsequent, the pardon goes into effect immediately, yet becomes void whenever the condition is broken." (1 Bish. Cr. L., § 914.) We do not dispute this latter proposition, but we think Judge Hurt misconstrues the extent to which a pardon upon subsequent condition is allowed to go into effect immediately. Mr. Bishop, in support of his text, cites two cases, only one of which has been accessible to us. In that case (*Flavell's Case*, 8 Watts & Serg. (Pa.), 197), the convict had been pardoned "on express condition that he be taken direct from the penitentiary on board the vessel which is to convey him out of the country, and there remain until the vessel put to sea." On *habeas corpus* the court discharged the prisoner under the pardon, holding that where a condition is annexed to a pardon "it lies upon the grantee to perform the condition. If he does not, in case of a condition precedent the pardon does not take effect; in case of a condition subsequent, such as this before us (if the condition is not performed), the pardon becomes null; and if the condition is not performed, the original sentence remains in full vigor and may be carried into effect." The case does not bear out the construction placed upon the text.

If the doctrine announced by Judge Hurt be correct, then there is absolutely no difference whatever between a full pardon and one upon a subsequent condition. If it goes into effect immediately so as to restore him to all his rights, the convict has all he could reasonably desire, and may well refuse to pay any regard to the subsequent condition, because it would not concern him materially. It is, however, not the time when a pardon commences to operate which determines its character and effect. Its character is ascertained by the terms in which it is expressed and the conditions annexed to it.

To illustrate: In the case of *Ex parte Wells*, 18 How. (U. S.), 307, Wells was convicted for murder and sentenced to death; the President of the United States granted him a conditional pardon, the condition being " that he should be imprisoned during his natural life." It was held by the supreme court that the pardon and subsequent conditions were valid. Now, then, here we have a party pardoned with subsequent conditions attached to the pardon; the pardon went into effect immediately. Will any one contend that because such pardon took effect immediately it thereby rehabilitated Wells and restored all his rights of citizenship? The supreme court expressly decided that it did not restore his liberty; and we feel confident that no court would hold that it restored his competency as a witness so long as he was suffering imprisonment as a convicted felon for the crime he originally committed. A mere remission or commutation of punishment cannot restore a felon's competency as a witness. (*Perkins* v. *Stephens*, 24 Pick., 277.) " It is only a full pardon of the offense which can wipe away the infamy of the conviction and restore the convict to his civil rights. . . . There is but one mode now in use of restoring the competency of a witness, and that is by pardon under the great seal of the State, which, when *fully* exercised, is an effectual mode of restoring the competency of a witness. It must be *fully* exercised to produce this effect; for, if the *punishment* only be pardoned or remitted, it will not restore the competency and does not remove the blemish of character. There must be *a free and full pardon of the offense* before these can be restored and removed. (Id.)

Is the pardon before us in this case a full pardon, or one which restores Hester to all his rights of citizenship? Let us apply the tests. Is his crime blotted out? Is his guilt remitted? Is he made a new man? Is he given new credit and capacity to the extent that he is the equal before the law of all his fellow-citizens in all his and their civil and criminal rights? (*Knote* v. *United States*, 5 Otto, 153.) If the conditions are valid, not one of these questions can

be affirmatively answered. His crime is not blotted out, because he can still be punished for it " whenever it shall be determined by the Governor that he has violated any of the criminal laws of the State." His guilt is not remitted, because the Governor still holds him subject to punishment for it if he determines that he has violated any of the criminal laws of the State. He is not made a new man, because liability to the same old punishment still attaches to him. He is not the equal before the law of the rest of his fellow-citizens. Why? Let us see. Suppose Hester and any one or more of his fellow-citizens should combine and unite together in committing a simple assault. His fellow-citizens, co-principals and co-conspirators, could only be punished by a fine of not more than $25. Hester, not more guilty than they, is not alone fined $25, but he is also seized by order of the Governor and incarcerated in the penitentiary, because by committing said assault he has violated a criminal law of the State. Under the conditions of this pardon the taint of his original crime clings to him like the shirt of Nessus as long as life lasts, and its punishment, like the sword of Damocles, is kept continually suspended over him. Such a pardon cannot restore a convict's competency as a witness. He is simply a ticket-of-leave-man,— with unrestrained liberty so long as he behaves himself, or so long as the Governor may not determine that he has committed some misdemeanor.

I am of opinion the witness Hester was wholly incompetent to testify, because he is a convicted felon whose disabilities have not been removed; and that the court erred in permitting him to testify, over objection of defendant. I concur in the other grounds stated in the opinion of Judge Hurt for a reversal of the judgment.

WILLSON, JUDGE. "A pardon is a remission of guilt." (1 Bish. Cr. Law, § 898.) It is full, partial, or conditional. *Full*, when it freely and unconditionally absolves the party from all the legal consequences of his crime and of his conviction, direct and collateral; including the punishment, whether of imprisonment, pecuniary penalty, or whatever else the law has provided. (1 Bish. Cr. Law, § 916.) *Partial*, where it remits only a portion of the punishment, or absolves from only a portion of the legal consequences of the crime. *Conditional*, where it does not become operative until the grantee has performed some specified act, or where it becomes void when some specified event transpires. (1 Bish. Cr. Law, § 914.)

In the case under consideration the pardon is clearly of this latter class. Its validity is made dependent upon the condition subsequent,

that the grantee shall not violate any of the criminal laws of this State. This condition is neither impossible, criminal nor illegal, but is within the limit of approved conditions, and therefore valid. It must, therefore, go with and form a part of the grant of pardon, and hence the pardon is not a *full* but a *conditional* pardon. Such being its character, it cannot have the effect to restore the competency of the witness Hester. It is only a *full* pardon that could have this effect. (1 Bish. Cr. Law, § 917; Whart. Cr. Ev., § 365.) I therefore concur in the opinion of Presiding Judge White, that the witness Hester was incompetent to testify, and that because he was permitted to testify the judgment should be reversed and the cause remanded.

*Reversed and remanded.*

[Opinions delivered December 16, 1885.]